**UNITED STATES of America,
Plaintiff,**

v.

**CERTAIN LAND SITUATED IN
THE CITY OF DETROIT,
et al., Defendants.**

**Nos. 79–CV–73934–DT, 96–CV–75494–
DT, 96–CV–75495–DT, 01–CV–
70391–DT.**

United States District Court,
E.D. Michigan,
Southern Division.

July 13, 2001.

**864**

See, also, 43 F. Supp.2d 762.

Michael K. Baker, Washington, DC, for Plaintiff.

Walter H. Lubienski, Dearborn, MI, Roger E. Craig, Naples, FL, Mark J. Zausmer, Farmington Hills, MI, Craig L. John, Bloomfield Hills, MI, James F. Hibey, Washington, DC, Willard J. Lindley, Warren, MI, for Defendants.

### OPINION AND ORDER REGARDING PLAINTIFF'S MOTION IN LIMINE TO EXCLUDE VALUATION TESTIMONY

ROSEN, District Judge.

## I. INTRODUCTION

This action presents an unfortunate example of the Government using its eminent domain power to the detriment of one private party for the benefit of another private party. This matter has been pending before this Court since December 1991.[1] In the face of allegations of collu-

---

1. For a full discussion of the history of this case, *see United States v. Certain Land,* 873

sion between the Government and the benefitted party, the Government for years repeatedly represented that it had no intention of putting the burdened party, Defendant Commodities Export Company ("Commodities"), out of business; that it only needed to condemn a small sliver of Commodities' parking lot, less than 1/10 acre of land, so that it could complete construction of a "much needed" truck ramp to a new U.S. Customs Cargo Inspection facility at the foot of the Ambassador Bridge in Detroit. Indeed, the Government, in its statements to the Court, implied that Commodities' conspiracy allegations were the product of its owner's paranoid delusions. In reliance, in part, on these representations of benign intent and effect, this Court and the Sixth Circuit Court of Appeals found no support for the collusion that was alleged.

Yet, after repeatedly making these representations to both this Court and the Court of Appeals for eight years, on the eve of trial, the Government suddenly did a complete about-face and informed the Court that it did indeed intend to condemn Commodities' property in its entirety. The Government then dragged its feet and did nothing for the next 10 months to amend its pleadings to effectuate a complete taking. Therefore, the Court ordered the Government to file an Amended Complaint and Amended Declaration of Taking within two months to reflect this total taking so the case could move forward. However, instead of complying with the Court's Order, the Government, for questionable tactical purposes, chose to ignore the Court's directive and filed an entirely "new" condemnation action, and is now asking the Court to find, for purposes of valuation, that the taking of Defendants' property did not occur until February 1, 2001, the date of filing the "new" condemnation complaint and declaration of taking. The Government further seeks an order precluding Defendants from presenting any evidence at trial concerning the ongoing business value of their operation of a duty-free store on the subject property.

Having misled this Court, the Court of Appeals, and the parties for years, and having blatantly ignored explicit Court Orders, the Court finds the Government's conduct in prosecuting this action to be at best calculating and disingenuous and, perhaps, worse, deceitful and deceptive. For these reasons, and for the reasons developed more fully below, the Government's Motion *in Limine* will be denied.

## II. *FACTUAL AND PROCEDURAL HISTORY*

For the better part of the last ten years, the Government has sought this Court's approval and endorsement of a settlement agreement (the "MOA") entered into between GSA and the Detroit International Bridge Company ("DIBCO"). Although the stated purpose of the MOA was the settlement of a 1979 eminent domain action brought by the Government to condemn certain parcels of land owned by DIBCO,[2] the MOA actually went beyond the physical boundaries of DIBCO's property and also called for the future condemnation of other neighboring properties, all for the ostensible purpose of expanding the U.S. Customs Cargo Inspection Facility on the American side of the Ambassa-

F.Supp. 1050 (E.D.Mich.1994), *aff'd,* 76 F.3d 380 (6th Cir.1996), *cert. denied,* 519 U.S. 819, 117 S.Ct. 72, 136 L.Ed.2d 32 (1996); *United States v. Certain Land,* 43 F.Supp.2d 762 (E.D. Mich.1999), *app. dismissed,* Sixth Cir. No. 99–1599 (Sept. 23, 1999). *See also, United States*

*v. Detroit International Bridge Co.,* 7 F.3d 497 (6th Cir.1993).

**2.** *See United States v. Certain Land,* E.D. Mich. No. 79–CV–73934–DT.

dor Bridge in Detroit. The Ambassador Bridge is owned by DIBCO.

The MOA called for the Government to pay DIBCO $1.24 million as compensation for the parcels of land owned by DIBCO which were being condemned. DIBCO, in turn, agreed to pay the Government for costs of acquisition of other properties within the "Expanded GSA Site." [3] Among these other properties designated for condemnation under the MOA is a parcel of land owned by Commodities Export Company and Walter Lubienski. Commodities operates a duty-free store on the subject property, which is located near the entrance ramp to the Ambassador Bridge. Walter Lubienski is the owner of Commodities.[4]

Commodities' only competitor for duty-free business in Detroit is Ammex Corporation. Ammex owns and operates a duty-free store situated on the Ambassador Bridge apron itself, beyond the "point of no return." (Ammex also operates the only duty-free store at the entrance of the Detroit–Windsor Tunnel, which is approximately five miles east of the Bridge.) The Manuel J. Mouron family, which owns Ammex, also owns and controls DIBCO, the owner of the Ambassador Bridge. For a number of years, Ammex has attempted—unsuccessfully—to buy out Commodities.

During the course of these proceedings, Commodities and Lubienski have challenged the condemnation of their property arguing that the Government and DIBCO were acting in consort and that the condemnation of Commodities' property was merely a sham to put Defendants out of business. At the time, the Court found no merit in Defendants' arguments because it found insufficient evidence of collusion to support Defendants' allegations. This determination was, in large part, due to the Government's repeated representations that it was only going to condemn a small corner of Commodities' parking lot, and thus, the duty-free business, which competed with Ammex/DIBCO, would not suffer any substantial impairment.

Since May of 1993, i.e., shortly after oral argument before the Sixth Circuit Court of Appeals in Defendants' first appeal in this matter,[5] the Government time and again avowed, both in pleadings, in on-the-record hearings, and in chambers conferences, that it had no intent of putting Commodities out of business. Rather, the Government's position for nearly eight years has been has that it only needed to take a small portion of Commodities' property. See, e.g., Plaintiff's July 18, 1994 Supplemental Brief in Opposition to Intervenor's Motion for Preliminary Injunction. ("[I]t has been GSA's expressed intention since May of 1993 to confine the proposed condemnation to the portion of Commodities' property depicted in Exhibit A.") See also, United States v. Certain Land, supra, 873 F.Supp. 1050, 1059.

In July 1994, the Government represented to this Court:

---

3. According to GSA, as of October 1998, there was approximately $1 million in the project fund, half of which (i.e., $500,000) was money paid by DIBCO.

4. Lubienski also owns a parcel of vacant land adjacent to Commodities' property which is also being condemned by the Government. See United States v. 0.41 Acres of Land and Walter Lubienski, E.D. Mich. No. 96–CV–75494–DT.

5. In 1992, the Court denied Defendants leave to intervene in the 1979 action. See, United States v. Certain Land, E.D. Mich. No. 79–CV–73934–DT (April 3, 1992 Opinion and Order). Defendants appealed and the Court of Appeals reversed that decision. See United States v. Detroit International Bridge Co., supra, 7 F.3d 497.

GSA intends to condemn only a small portion of the parking lot, in fee, for the truck ramp [to the cargo inspection facility]. GSA intends to condemn an additional easement for ingress and egress to a government employee parking lot. The easement would be open at all times to Commodities for its own use. The government parking lot will be constructed on property adjacent to Commodities property....

[Plaintiff's 7/18/94 Supp. Brief, p. 2.]

It was in large part due to the Government's representations that Commodities would not be put out of business that both this Court and the Sixth Circuit Court of Appeals found insufficient basis for the preliminary injunctive relief sought by Commodities and Lubienski to block implementation of the MOA. *See United States v. Certain Land,* 873 F.Supp. 1050, 1059.[6] *See also,* Sixth Cir. No. 92–1687, Transcript of April 30, 1993 Oral Arguments, p. 29.[7]

Consistent with its representations, the Government's condemnation Complaint against Commodities' property filed in 1996 called for only the taking in fee of a corner of Commodities' parking lot to complete a truck ramp off the Bridge, and the taking of an easement across Commodities' parking lot for access to a to-be-constructed government parking lot on adjacent property.[8]

The Government reiterated its intent to take only a small "slice" of Commodities' parking lot at the October 15, 1998 hearing on the parties' cross motions for summary judgment. At that hearing, in response to questioning by the Court, GSA's representative Tom Malkin stated:

THE COURT: You have no contemplation of condemning—you, GSA, has no contemplation of condemning Mr. Lubienski's entire property?

MR. MALKIN: We do not.

THE COURT: You do not intend to do that?

MR. MALKIN: No.

\* \* \* \* \* \*

THE COURT: You intend to take the back four blocks [i.e., adjacent property owned by Lubienski]. But you have no contemplation of taking his store property, the Commodities property?

MR. MALKIN: Not the entire property. Just a slice, a slice of the parking lot.

[10/15/98 Hrg. Transcript pp. 70–71.]

Accordingly, all parties concerned, i.e., Defendants, this Court and the Sixth Circuit Court of Appeals, proceeded in this matter for more than seven years with the

---

**6.** In its December 1994 Opinion denying Defendants' Motion for Preliminary Injunction, the Court observed:

[T]he Government has represented that it only intends to condemn, in fee, a small portion of Commodities Export's parking lot and take an easement over the parking lot for ingress and egress to adjoining property. It is not going to put Commodities out-of-business so as to create a "duty-free monopoly."

873 F.Supp. at 1059.

**7.** At the April 30, 1993 hearing in the Court of Appeals, Judge Keith inquired of the Government's counsel:

Q: If you can answer this question, is it your position that Commodities will not be affected and prejudiced by this settlement [i.e., the MOA] that the Government wants to enter into with the—their competitor?

Counsel for the Government responded:

A: Yeah, that is our position.

[4/30/93 Transcript of Oral Arguments p. 29.]

**8.** *See United States v. 0.074 Acres of Land,* E.D. Mich. No. 96–CV–75945–DT.

understanding that Commodities would not be substantially affected by the Government's condemnation of its property and that the Government was only going to take a small "slice" of Commodities' parking lot and an easement over the lot to a new government parking area.

In light of these express representations by the Government, this Court and the Sixth Circuit[9] found no support for Defendants' allegations that the Government and its competitors had colluded to put Defendants out of business through a condemnation process financed in part by the competitor under the auspices of the MOA. Therefore, on March 24, 1999, the Court issued its Opinion and Order on the Parties' Cross–Motions for Summary Judgment, upholding in that Opinion and Order the validity of the contemplated condemnation of Commodities' and Lubienski's property, and trial on the just compensation issue was scheduled for March 2000.

However, on February 23, 2000, on the eve of the then scheduled Final Pre–Trial Conference, the Government's attorney contacted the Court to advise that the Government intended to amend its Complaint/Declaration of Taking on Commodities' property to condemn the property in its entirety.[10] Meanwhile, in an attempt to facilitate settlement, the Court appointed a Special Mediator/Facilitator who explored with the parties valuation options and settlement prospects. Mediation/facilitation ultimately proved unsuccessful.

The Court, therefore, convened another Pre–Trial Conference in December 2000 with the intent of getting this matter to trial in early 2001. The Court was made aware at that December conference that at no time during the preceding 10 months did the Government take any action to amend its Complaint/Declaration of Taking of Commodities' property as it had represented it intended to do in February 2000. Therefore, on December 19, 2000, the Court issued an Order directing the Government to file with the Court and serve upon Defendants its Amended Condemnation Complaint by February 1, 2001. [*See* December 19, 2000 Order.]

Despite the Court's explicit Order, rather than amending its 1996 Condemnation Complaint/Declaration of Taking, on January 29, 2001, the Government filed an entirely new condemnation action to take all of Commodities' property. *See United*

---

**9.** *See e.g., United States v. Certain Land, supra,* 873 F.Supp. at 1059 (Dec. 30, 1994 Opinion and Order denying preliminary injunction); *United States v. Certain Land, supra,* Sixth Cir. No. 99–1599 (Sept. 23, 1999 Order dismissing appeal) ("There is little if any support for defendants' allegation that Commodities Export Company will be put out of business....")

**10.** The Government's attorney represented to the Court that GSA had just received a "study report" concerning the volume of customs traffic at the Detroit Ambassador Bridge recommending that GSA further expand the customs inspection facility project. Because of this recommendation of further expansion, counsel for the Government represented that GSA decided to take all of Commodities' property.

Interestingly, in response to an inquiry by the Court during a recent chambers conference, counsel for the Government indicated that it would not be feasible to relocate Commodities' duty-free store anywhere on the expanded takings site. Thus, Commodities' competitor, Ammex, would, upon completion of the project, be the only duty-free store in Detroit, giving it a monopoly—just as Commodities alleged in its initial pleadings. Although coincidence may be the drama of life, in the context of the Government's aspersions about Mr. Lubienski's "paranoia," the Court is more aptly reminded of the American poet Delmore Schwartz's observation (often attributed to Henry Kissinger), "Even paranoids have real enemies."

*States v. 0.41 Acres of Land, et al.*, No. 01–CV–70291–DT. (The case was originally assigned to the Hon. Julian A. Cook but reassigned to this Court under the Court's Local Rules regarding "companion cases.")

In its December 19, 2000 Order, the Court also ordered the parties to file briefs on the methods of valuation and the standard or standards to be used to determine value, ordered Commodities to provide the Government with its financial records, and directed the parties to have their experts review the records so that expert reports could be filed promptly after the Court issued its ruling on the methods/standards of valuation.

On February 9, 2001, apparently in response to the Court's December 19, 2000 Order directing the parties to file briefs on their proposed methods and standards to be used to determine the value of Defendants' property, the Government filed the instant "Motion *in Limine* to Exclude Valuation Testimony," seeking from the Court an order precluding Defendants from presenting any evidence at trial concerning the value of Commodities' duty-free business. Commodities Export and Mr. Lubienski filed their Response opposing the Government's Motion on February 28, 2001 to which the Government replied on March 12, 2001. The Court advised the parties during a telephonic conference on May 11, 2001 that oral argument would not be not necessary. Therefore, pursuant to Eastern District of Michigan Local Rule 7.1(e)(2), this matter will be decided "on the briefs."

## III. *DISCUSSION*

### A. *BASIC "JUST COMPENSATION" PRINCIPLES*

The Fifth Amendment of the United States Constitution provides:

No person shall be held to answer for a capital, or otherwise infamous crime, unless on a presentment or indictment of a Grand Jury, except in cases arising in the land or naval forces, or in the Militia, when in actual service in time of War or public danger; nor shall any person be subject for the same offence to be twice put in jeopardy of life or limb; nor shall be compelled in any criminal case to be witness against himself, nor be deprived of life, liberty, or property, without due process of law; **nor shall private property be taken for public use, without just compensation.**

U.S. Const., Amend. V (emphasis added).

The Supreme Court construed the final clause of the Fifth Amendment, the "Just Compensation Clause," in *Monongahela Navigation Co. v. United States*, 148 U.S. 312, 13 S.Ct. 622, 37 L.Ed. 463 (1893):

The language used in the fifth amendment with respect to this matter is happily chosen. The entire amendment is a series of negations, denials of right or power in the government; the last (the one in point here) being: "Nor shall private property be taken for public use without just compensation." The noun "compensation," standing by itself, carries the idea of an equivalent.... So that, if the adjective "just" had been omitted, and the provision was simply that property should not be taken without compensation, the natural import would be that the compensation should be the equivalent of the property. And this is made emphatic by the adjective "just." There can, in view of the combination of those two words, be no doubt that the compensation must be a full and perfect equivalent for the property taken....

148 U.S. at 324–326, 13 S.Ct. at 625–626.

Extrapolated from the *Monongahela* decision, thus, is that in determining the

issue of "just compensation", courts are to be guided by the principle that the compensation given by the Government for the taking of private property should be a "full and perfect equivalent" for the property taken.

The *Monongahela* Court further instructed that the Just Compensation Clause should be liberally construed, explaining:

[C]onstitutional provisions for the security of person and property should be liberally construed. A close and literal construction deprives them of half their efficacy, and leads to gradual depreciation of the right, as if it consisted more in sound than in substance. It is the duty of the courts to be watchful for the constitutional rights of the citizen, and against any stealthy encroachments thereon. Their motto should be *obsta principiis*.

*Id.*, quoting *Boyd v. United States*, 116 U.S. 616, 635, 6 S.Ct. 524, 29 L.Ed. 746 (1886).

In the years since *Monongahela*, the Supreme Court "has been careful not to reduce the concept of 'just compensation' to a formula," *United States v. Cors*, 337 U.S. 325, 332, 69 S.Ct. 1086, 1090, 93 L.Ed. 1392 (1949), and has steadfastly refused to prescribe a rigid rule for determining what constitutes "just compensation" under all circumstances and in all cases. *United States v. Commodities Trading Corp.*, 339 U.S. 121, 123, 70 S.Ct. 547, 549, 94 L.Ed. 707 (1950). Rather, the Court has chosen a flexible approach dependent upon the facts and circumstances presented, repeatedly emphasizing that " '[t]he constitutional requirement of just compensation **derives as much content from the basic equitable principles of fairness,'** as it does from technical concepts of property law." *United States v. Fuller*, 409 U.S. 488, 490, 93 S.Ct. 801, 803 (1973), quoting

*United States v. Commodities Trading Corp.*, *supra*, 339 U.S. at 124, 70 S.Ct. at 549 (emphasis added). *See also, Almota Farmers Elevator & Warehouse Co. v. United States*, 409 U.S. 470, 478, 93 S.Ct. 791, 797, 35 L.Ed.2d 1 (1973).

Guided by such equitable precepts, the Supreme Court has adhered to the principle that the dispossessed owner "is entitled to be put in as good a position pecuniarily as if his property had not been taken." *See, Olson v. United States*, 292 U.S. 246, 255, 54 S.Ct. 704, 708, 78 L.Ed. 1236 (1934); *United States v. Miller*, 317 U.S. 369, 373, 63 S.Ct. 276, 279, 87 L.Ed. 336 (1943); *United States v. Reynolds*, 397 U.S. 14, 16, 90 S.Ct. 803, 805, 25 L.Ed.2d 12, (1970); *Almota Farmers Elevator and Warehouse Co. v. United States*, *supra*, 409 U.S. at 474, 93 S.Ct. at 794; *United States v. 564.54 Acres of Monroe and Pike County Land*, 441 U.S. 506, 510, 99 S.Ct. 1854, 1856, 60 L.Ed.2d 435 (1979). As the *Almota Farmers Elevator* Court succinctly put it:

"It is, of course true that [the condemnee] should be in no better position than if he had sold its [property] to a private buyer, but his position should surely be no worse."

409 U.S. at 474, 93 S.Ct. at 794.

In an endeavor to do "substantial justice" in eminent domain proceedings, the courts have adopted a number of "working rules" and "practical standards" to supplement these basic fairness principles. *United States v. Cors*, *supra*; *United States v. Miller*, *supra*, 317 U.S. at 374, 63 S.Ct. at 280. Among these working rules and practical standards are the following precepts.

In general, the measure of compensation is to be the value of the property at the date of the taking. *See, e.g., United States v. Miller*, *supra*. In most cases, the "val-

ue" of the property can be "justly" determined by its monetary "market value." *United States v. Toronto, Hamilton & Buffalo Nav. Co.*, 338 U.S. 396, 402, 70 S.Ct. 217, 94 L.Ed. 195 (1949). Under this standard, the owner is entitled to receive "what a willing buyer would pay in cash to a willing seller." *United States v. Miller, supra*, 317 U.S. at 374, 63 S.Ct. at 280; *United States v. 564 Acres of Monroe and Pike County Land, supra; United States v. Virginia Electric & Power Co.*, 365 U.S. 624, 633, 81 S.Ct. 784, 790, 5 L.Ed.2d 838 (1961); *Almota Farmers Elevator and Warehouse Co. v. United States supra*, 409 U.S. at 474, 93 S.Ct. at 794. And, since a hypothetical "reasonable person," willing buyer will purchase land with an eye to not only its existing use but to other potential uses as well, fair market value takes into consideration "the highest and best use" for which the property is suited. *Olson v. United States, supra*, 292 U.S. at 255, 54 S.Ct. at 708.

The Supreme Court has repeatedly emphasized, however, that these rules and standards are **not** absolute and invariable. *United States v. Commodities Trading Corp., supra*, 339 U.S. at 123, 70 S.Ct. at 549; *United States v. Miller, supra*, 317 U.S. at 375, 63 S.Ct. at 280; *United States v. 564 Acres of Monroe and Pike County Land, supra*, 441 U.S. at 512, 99 S.Ct. at 1857. There are cases that involve peculiar or unique circumstances in which it is impossible to determine a "market" value or where strict adherence to the concept of market value or one of the other general rules would result in manifest injustice to the owner or to the public. For cases such as these, courts have fashioned and applied other rules and standards. *See United States v. Commodities Trading Corp., supra; United States v. Miller, supra*. However, even such secondary rules and standards are not absolute. *United States v. 320.0 Acres of Land in Monroe County,*

*Florida*, 605 F.2d 762, 781 (5th Cir.1979). "[T]he only sure guide in a difficult condemnation case is the consideration of '[w]hat is 'just' both to the owner whose property is taken and to the public that must pay the bill.' " *Id.*, quoting, *United States v. Commodities Trading Corp., supra*, 339 U.S. at· 123, 70 S.Ct. at 549.

With the foregoing basic principles in mind, the Court now turns to the Government's arguments for excluding at trial all valuation evidence based on Commodities Export Company's duty-free business.

B. *THE EFFECT OF THE CUSTOMS SERVICE'S REGULATORY AUTHORITY ON VALUATION*

■ The Government first argues that the right to operate a duty-free store is a personal right which is not transferable with the land. The Government's argument is that because the right of any person to operate a duty-free store is dependent upon the discretion and authority of the United States Customs Service, the compensation that would be normally paid for an on-going business in a "willing buyer/willing seller" scenario does not apply. Therefore, the Government contends that the trier-of-fact should not be permitted to consider valuation evidence based upon the value of Defendants' duty-free business. In making this argument, the Government reasons that since it cannot be said with certainty that Customs would approve Defendants' hypothetical willing buyer, the fact-finder should not be allowed to consider the continued use of the property as a duty-free business by someone other than Defendants because without Customs' approval, such a use would be illegal.

In support, the Government relies upon *United States v. 320.0 Acres of Land, supra* (referred to herein as "the *Florida Everglades* case"). That case involved the

taking of essentially undeveloped land in Florida for the establishment of the Everglades National Park. The owners of the condemned property at issue there sought to introduce valuation evidence of the "highest and best use" of the property evidence showing that, although on-the-ground cabins could not built because of below sea-level elevation and muckish soil, the property nonetheless could be developed for recreational cabin/cottage use by building "stilt houses", boardwalks, and boat docks for mooring houseboats. (Owners of some of the parcels, in fact, had already constructed makeshift boardwalks and boat docks on their properties and sought to present evidence of them to demonstrate the feasibility of the potential for recreational cabin site development.)

The district court refused to admit evidence of such potential recreational uses for the property. On appeal, the Fifth Circuit determined that evidence of such potential uses should have been admitted by the trial court if the property was shown to be suitable or adaptable for such uses and so long as such uses were not precluded by zoning or other regulatory restrictions.

The *Everglades* case, however, is of little import in this case where we are not dealing with valuing *potential* uses. Rather, we are dealing with valuing the property's *current, existing* use. This distinction was stressed by the Fourth Circuit in *United States v. 69.1 Acres of Land*, 942 F.2d 290 (4th Cir.1991):

> Most parcels of land are adaptable to several uses, and just compensation is measured by the use that would bring

the highest price—the "highest and best" use. In the absence of proof to the contrary, **the highest and best use of property is presumed to be its current use.**

> *Where a landowner posits that a **different use** is "highest and best,"* he must show that this use is "reasonably probable" and that the probability has a real market value.

942 F.2d at 291 (emphasis added).

The Sixth Circuit also adheres to the presumption that the highest and best use of property is its current use. *See United States v. L.E. Cooke Co.*, 991 F.2d 336, 340 (6th Cir. 1993). *See also, United States v. 158.24 Acres of Land*, 515 F.2d 230 (5th Cir.1975).

Because Defendants seek to introduce evidence of the value of its current use of the subject property, the Government's reliance on the *Florida Everglades* case is misplaced.

Furthermore, even if the Court were persuaded that the *Everglades* case were applicable here, there is nothing in the record of this case or in the statutes or regulations pertaining to duty-free enterprises that suggests that a duty-free business is a *precluded* or *prohibited* use of Defendants' property.[11] Defendants have operated a duty-free store in the same location for the past 24 years. Moreover, the statutory provisions governing duty-free enterprises establish that use of the site for the operation of a duty-free business would not be prohibited.

---

**11.** This was an issue in the *Everglades* case because the stilthouses, makeshift docks, boardwalks which three of the property owners had constructed on their parcels of land were allegedly "illegal". The court held that it was the Government's burden to prove that an existing structure is illegal and that a per-

mit or variance was required at the time the structures were built. It is then open to the landowner to prove that the relevant regulatory authority might nonetheless grant an after-the-fact permit or otherwise allow the structure to remain. *See* 605 F.2d at 820–822.

19 U.S.C. § 1555(b) provides, in pertinent part:

Each duty-free sales enterprise—

\* \* \* \* \* \*

(F) shall deliver duty-free merchandise—

\* \* \* \* \* \*

    (ii) in the case of a duty-free enterprise that is a border store—

        (I) at a merchandise storage location at or beyond the exit point; or

        (II) **at any location approved by the Secretary before the date of enactment of the Omnibus Trade Act of 1987 [i.e., August 23, 1988].**

19 U.S.C. § 1555(b)(F)(ii) (emphasis added).

Here, Commodities Export's property was approved as a site for the delivery of duty-free merchandise and the operation of a duty-free business in the summer of 1976, i.e., before the date of enactment of the Omnibus Trade Act of 1987. The Government attempts to remove Commodities from Section 1555(b)'s grandfather clause by arguing that Defendants' property was never "approved" for a duty-free operation, but rather that the store has only been allowed to exist because of Judge Pratt's 1977 injunction. The Government's argument is not supported by the record.

The record of the 1977 action [12] shows that Judge Pratt made detailed findings of fact after a full evidentiary trial-on-the-merits and **specifically found that Defendants had been given unconditional approval by Customs to operate their duty-free business on the subject property in the summer of 1976.** [*See* Plaintiff's Ex. A.] [13] Judge Pratt enjoined the Customs

---

**12.** *See Commodities Export Co. v. U.S. Customs Service*, E.D. Mich. No. 6–72292, March 4, 1977 Memorandum Opinion and Order Granting in Part Plaintiff's Motion for Preliminary Injunction.

**13.** At the February 22, 1977 evidentiary hearing/trial on the merits before Judge Pratt, Customs officials testified that on March 9, 1976, several Customs Service officers from the Detroit Customs Office conferred with Commodities principals and inspected the site and building from which Commodities proposed to operate a duty-free business. [*See* Ex. A, p. 4.] Because Defendants' proposed site was before the "point of no return" on the Ambassador Bridge, Defendants had to satisfy Customs that their business would be so situated, and a mode of operation in place, to insure that goods purchased at the duty-free store would immediately be taken out of the country. Defendants' proposed mode of operation called for customers to stop at the store where they would give their order to an employee who would transmit it both to an employee inside the warehouse to be processed, and to a Customs officer in the front of the store who would then visually watch and supervise the transfer of the merchandise, record the transaction, and then watch to ensure that the vehicle properly proceeded west on Porter Street to the Bridge entrance and directly to the Customs check point. *Id.* at pp. 3–4.

After their on-site inspection, the Customs officials from the Detroit Office conferred and decided to approve Commodities and grant its application for a "bonded warehouse" a/k/a "duty-free store." *Id.* at p. 5. The District officials also discussed the matter with the Assistant Regional Director of Customs from the Regional Office. *Id.* The approval was subsequently orally conveyed to Mr. Lubienski. *Id.* at p. 6. After receiving this approval, Defendants expended substantial sums of money to improve the building's facilities and commenced sales operations in July 1976. *Id.* All parties testified that there were no substantial problems or irregularities with the operation of the duty-free store. *Id.*

On October 12, 1976, however, the Detroit Customs Office sent Defendants a letter indicating that the operation of their duty-free enterprise outside of the "point of no return" was not in conformity with Customs Service Headquarters directives. *Id.* at p. 8. Customs offered Defendants two alternatives: (1) lease a site on the bridge apron beyond the toll booths where a booth for the warehouse officer could be located and "cart" merchandise to that booth for supervised exportation; or

Service from later enforcing a Customs Headquarters directive—which Customs officials admitted they were fully aware of when they approved the business three months earlier—that would have had the effect of nullifying their prior approval. *Id.* Thus, the evidence of record establishes that Commodities' property was approved as a site for a duty-free business prior to August 23, 1988.

The Government further argues that, since Customs has been given broad authority to regulate duty-free businesses, including the authority to approve any new owners of such a business, until such approval is specifically given, under the *Florida Everglades* case, the Court should view any hypothetical prospective purchaser's use of the subject property as a duty-free store "illegal" and, accordingly, preclude evidence of such an illegal use.[14] The Government, however, has not made any kind of showing that it would be unlikely that approval of a purchaser to continue Commodities' duty-free business would be given. Indeed, the requirements for approval of an owner of a duty-free store do not appear to be onerous. *See* 19 C.F.R. § 19.2.[15] In fact, it appears that no more is

(2) have the Customs warehouse officer ride in Commodities' vehicle with the merchandise to the point of no return on the Bridge where it would be turned over to the customer. *Id.* at p. 8. Defendants were given the choice to bring their operation into compliance by revising their duty-free operation pursuant to one of these two alternatives, or cease doing business. *Id.*

Judge Pratt issued an injunction permanently restraining Customs from enforcing the October 12, 1976 directive because he found that Customs had violated the Administrative Procedures Act by failing to publish the Customs Headquarters directives in the *Federal Register* or otherwise provide timely notice of them to Defendants. *Id.*

Judge Pratt explained his ruling:
[H]ere, Customs approved [Commodities] proposal and stood by while [Defendants] invested substantial resources into its operation yet did not make the contents of the directive (on which they relied while approving the proposal) known to [Defendants]. Under these circumstances therefore this Court is mandated, pursuant to § 706(2)(D) and § 552(a)(1)(D) of the [Administrative Procedures] Act, to restrain the enforcement of this Customs directive. . . .
*Id.* at pp. 14–15.

**14.** The *Everglades* court held as follows:
[W]e hold that it is the trial court's responsibility under Rule 71A(h) to screen all proffered potential use evidence and exclude from consideration by the trier of fact evidence of any potential uses upon which a just compensation award may not, as a matter of law, be based. This of course encompasses alleged potential uses which have not been demonstrated to be practicable and reasonably probable even absent regulatory restrictions as well as potential uses that are proscribed by legal restrictions from which there is no reasonable possibility of relief. If, however, the party offering the potential use evidence (almost invariably, the landowner) is able to meet this threshold burden, then evidence pertaining to that use must be submitted to the trier of fact under whatever instructions are appropriate, and the weight of that evidence as regards the fair market value of the property is for the trier of fact to decide.
605 F.2d at 819.

**15.** The regulations require that an owner or lessee desiring to establish a duty-free store make a written application, describing the premises and giving its location. 19 C.F.R. § 19.2(a). The local Customs director may also require the applicant to provide a list of names and address of all officers and managing officials of the warehouse and all persons who have a financial interest in the operation. *Id.* The applicant also must submit proof of fire insurance, a map showing the location of the establishment in respect to the port of entry, and a description of the store's procedures, including inventory control, recordkeeping and delivery methods. *Id.* § 19.2(b). The regulations further provide that the port director *may*, as a condition of approval, inquire into the personal, financial and credit history of the applicant, ask for personal references, and require the applicant to submit fingerprints of all officers and managing officials of the business. *Id.* § 19.2(f).

required of a prospective duty-free store owner than what is generally required in a mortgage application, i.e., personal, financial and credit history, proof of insurance, etc. *Id.*

As noted above, under the *Everglades* case, if a proposed use is precluded by regulatory restrictions, all that must be shown is that obtaining a land use permit or variance is "reasonably *possible.*" 605 F.2d at 819 (emphasis added). It is only when there is "no reasonable possibility of relief" from the regulatory restrictions that a trial court may properly exclude evidence of the proffered potential use. *Id. See also,* note 10, *supra.*

Given that the requirements for approval as an owner of a duty-free business are not onerous, and given that the Government has not shown that it would be unlikely for Customs to approve a transfer of ownership of Commodities' duty-free store, the Court finds that it is "reasonably possible" that Customs' approval could be obtained. As the *Everglades* court made clear, if there is a reasonably possibility that a permit for the proposed use would issue, the owner is entitled to have that "reasonably possibility" considered by the jury, and it is up to the jury, then, to determine what effect this reasonable possibility has upon the fair market value of the property. *Id.*[16]

In sum, the Court finds no basis for precluding evidence of the value of Com-

modities' business based upon the Customs Service's regulatory authority over duty-free enterprises.

## C. THE "ADDED VALUE" CASES HAVE NO APPLICATION HERE

■ The Government also contends that when the U.S. Customs Service grants an applicant approval to operate a duty-free store, it "adds an increment of value" to that particular site. Because the Supreme Court has held that the Government should not be made to pay a condemnee for elements of property value it has created, Plaintiff argues that the just compensation it must pay to Defendants for Commodities' property should not include the value of its duty-free business.

In support of this argument, the Government relies upon a line of cases involving condemnation of riverfront properties. *See United States v. Twin City Power Co.,* 350 U.S. 222, 76 S.Ct. 259, 100 L.Ed. 240 (1956); *United States v. Rands,* 389 U.S. 121, 88 S.Ct. 265, 19 L.Ed.2d 329 (1967). *See also, United States v. Commodore Park,* 324 U.S. 386, 65 S.Ct. 803, 89 L.Ed. 1017 (1945). These cases involved the Government's condemnation of riparian lands in connection with the exercise of its dominant servitude in the flow of navigable waters and the amount of compensation owed to the landowners for the properties taken.

---

**16.** Commodities argues that Customs is enjoined from refusing to approve any subsequent owners of Commodities' property for the operation of a duty-free business contending that Judge Pratt's injunction inures to successors-in-interest of Commodities. Judge Pratt, however, expressly limited his injunctive order:

IT IS FURTHER ORDERED AND ADJUDGED that this Judgment shall be binding **only** upon the parties to this action, their officers, agents, servants, employees

and attorneys, and upon those persons in active concert or participation with them who receive actual notice of this Judgment by personal service or otherwise.

[*See* Judgment of the Court Granting Plaintiff's Motion for Permanent Injunctive Relief, Plaintiff's Ex. B–1, p. 3 (emphasis added). *See also,* Consent Order Amending Judgment, Plaintiff's Ex. B–3, p. 2.]

Nothing in Judge Pratt's Orders suggests to this Court that the injunction extends to subsequent purchasers.

In *Twin Cities*, the Government condemned certain undeveloped property on the bank of the Savannah River as part of a river basin improvement project. The property was owned by a power company. The power company sought to recover from the Government the value of the potential use of the land as a hydroelectric power plant. In *Rands*, the Government condemned the defendant's undeveloped property in connection with the John Day Lock and Dam Project, which was part of a comprehensive plan for the development of the Columbia River. The landowner in that case sought to recover the value of the land as a potential port site. In both cases, the Supreme Court determined that the "special value" of the land as a power plant or a port site was "due to the flow of the stream." Because such value does not inhere in the land itself, but depends on use of the water to which the landowners have no right as against the United States, the Court held that the Government cannot be required to pay any hypothetical additional value to the riparian landowners who had no right to appropriate the current to their own commercial uses.

The reasoning behind the Court's rulings in these cases was succinctly stated by Justice White in *Rands:*

> The Commerce Clause confers a unique position upon the Government in connection with navigable waters. The power to regulate commerce comprehends the control for that purpose, and to the extent necessary, of all the navigable waters of the United States. For this purpose they are the public property of the nation.... This power to regulate navigation confers upon the United States a "dominant servitude," which extends to the entire stream and the stream bed below ordinary high-water mark. The proper exercise of this power is not an invasion of any private property rights in the stream or the lands underlying it, for the damage sustained does not result from taking property from riparian owners within the meaning of the Fifth Amendment but from the lawful exercise of this power to which the interests of riparian owners have always been subject. Thus, without being constitutionally obligated to pay compensation, the United States may change the course of a navigable stream, or otherwise impair or destroy a riparian owner's access to navigable waters, even though the market value of the owner's land is substantially diminished.

> ... [J]ust as the navigational privilege permits the Government to reduce the value of riparian lands by denying the riparian owner access to the stream without compensation for his loss, it also permits the Government to disregard the value arising from this same fact of riparian location in compensating the owner when fast lands are appropriated.... Such value does not inhere in these parcels as upland, but depend on use of the water to which the [landowner] has no right as against the United States: The government ha[s] dominion over the [flow of] the water..., and cannot be required to pay any hypothetical additional value to a riparian owner who had no right to appropriate the current to his own commercial use....

> ... The value of the land attributable to its location on the stream was due to the flow of the stream; and if the United States were required to pay the judgments below, it would be compensating the landowner for the increment of value added to the fast lands if the flow of the stream were taken into account.

389 U.S. at 122–24, 88 S.Ct. at 266–67 (quotation omitted and citations omitted).

The Supreme Court subsequently commented on these navigational servitude cases in *United States v. Fuller*, 409 U.S. 488, 93 S.Ct. 801, 35 L.Ed.2d 16 (1973). In *Fuller* the United States condemned part of a large ranch which was adjacent to federal grazing permit lands owned by the Government. The issue in that case was whether the rancher's use or potential use of the adjacent federal grazing permit lands could be considered in valuing the ranch. The Court held that any increased value brought about by the use of the adjacent federal lands was not compensable. Analogizing the case to the navigational servitude cases, the *Fuller* Court, reasoned:

> These cases go far toward establishing the general principle that the Government as condemnor may not be required to compensate a condemnee for elements of value that the Government has created, or might have destroyed under the exercise of governmental authority other than the power of eminent domain. If, as in *Rands*, the Government need not pay for value that it could have acquired by exercise of a servitude arising under the commerce power, it would seem *a fortiori* that it need not compensate for value which it could remove by revocation of a permit for the use of lands that it owned outright.

409 U.S. at 492, 93 S.Ct. at 804.

It is based upon the *Fuller* Court's construction and application of the navigational servitude decisions that the Government here argues that the value of Defendants' duty-free business should not be included in determining just compensation. The Government's theory here is that, acting pursuant to its power under the Commerce Clause to regulate the flow of goods in interstate and foreign commerce, the Government (i.e., the U.S. Customs Service) has the authority to grant permission to operate a duty-free business. The issuance of an approval letter by Customs allowing a duty-free business to operate creates an increment of value in the land that did not exist prior to such approval. Therefore, the Government contends that under *Rands*, *Twin City*, and *Fuller*, it should not be made to pay for any increase in the value of Defendants' property which was brought about by the exercise of its regulatory power under the Commerce Clause.

The Government's argument, however, overlooks one very significant fact which renders this case readily distinguishable from *Rands*, *Twin City*, and *Fuller*. In the navigational servitude cases and in *Fuller*, the "added value" arose as a result of the location of the condemnees' properties *adjacent* to property owned (or in the case of the navigational servitude cases "controlled") by the Government, and the property owners' attempt to "aggregate" the value of their respective properties with the value of the Government's adjacent property. In speaking of "no added value when such value depends upon the Government's ability to permit or refuse use" in those cases, it was the right of the Government **to permit or refuse use of the *adjacent* property or waters owned or controlled by the Government** that the Court focused on. Nothing in those cases suggests that the Government's right to approve or disapprove operation of a business **on the *condemnee's* property** constitutes such prohibited "added value." Indeed, the *Fuller* Court was careful to delimit the scope of those rulings. The Court stated:

> We do not suggest that such a general principle [i.e., that the Government "may not be required to compensate a condemnee for elements of value that the Government has created, or that it might have destroyed under the exercise

of governmental authority other than the power of eminent domain"] can be pushed to its ultimate logical conclusion. In *United States v. Miller, supra,* the Court held that just compensation did include the increment of value resulting from the completed project to neighboring lands originally outside the project limits, but later brought within them. Nor may the United States be excused from paying just compensation measured by the value of the property at the time of the taking because the State in which the property is located might, through the exercise of its lease power, have diminished that value without paying compensation. *United States, ex rel TVA v. Powelson,* 319 U.S. 266, 284, 63 S.Ct. 1047, 87 L.Ed. 1390 . . .

Courts have had to adopt working rules in order to do substantial justice in eminent domain proceedings. Seeking as best we may to extrapolate from these prior decisions such a "working rule," we believe that there is a significant difference between the value added to property by a completed public works project, for which the Government must pay, and the value added to fee lands by a revocable permit authorizing the use of neighboring lands the Government owns. The Government may not demand that a jury be arbitrarily precluded from considering as an element of value the proximity of a parcel to a post office building, simply because the Government at one time built the post office. But here respondents rely on no mere proximity to a public building or to public lands dedicated to, and open to, the public at large. Their theory of valuation aggregates their parcel with land owned by the Government to form a privately controlled unit from the which the public would be excluded. If, as we held in *Rands,* a person may not do this with respect to property interests sub-

ject to the Government's navigational servitude, he surely may not do it with respect to property owned outright by the Government. The Court's statement in *Rands* respecting portsite value is precisely applicable to respondents' contention here that they may aggregate their fee lands with permit lands owned by the Government for valuation purposes:

> If the owner of the fast lands can demand port site value as part of his compensation, he gets the value of a right that the Government in the exercise of its dominant servitude can grant or withhold as it chooses. . . . To require the United States to pay for this . . . value would be to create private claims in the public domain.

> We hold that the Fifth Amendment does not require the Government to pay for that element of value based on the use of respondents' fee lands in combination with the Government's permit lands.

409 U.S. at 492–493, 93 S.Ct. at 804–805 (citations omitted).

The foregoing discussion makes clear that the Government's "prohibited 'added value'" argument in this case is without merit. Here, not only is there no permitted use of adjacent Government land, but more importantly, any "added value" is not the result of Customs' approval of the operation of the business, but rather it arises as a result of the unique location of the property itself. Given that the entire premise behind duty-free stores is that merchandise purchased there must be immediately exported from the customs territory, a duty-free store can only be effectively operated at a site in close proximity to the point of entry into or exit from the country. Therefore, it is not so much that a permit or approval is unique—it is the unique location of the property that makes

the business operable. Therefore, the Court rejects the Government's "added-value-based-on-Customs-approval" arguments.

### D. *VALUATION OF DEFENDANTS' PROPERTY BASED ON THE VALUE OF THE DUTY–FREE BUSINESS*

■ Third, the Government argues that, assuming the right to operate a duty-free store is transferable, the law precludes valuing property based on the income of a business operating on the condemnee's property. In making this argument, the Government relies upon a line of federal eminent domain cases prohibiting compensation for loss of business profits or "going concern" value of a business operated on the condemned property. *See e.g., Mitchell v. United States,* 267 U.S. 341, 344, 45 S.Ct. 293, 69 L.Ed. 644 (1925); *United States, ex rel. T.V.A. v. Powelson,* 319 U.S. 266, 281–83, 63 S.Ct. 1047, 87 L.Ed. 1390 (1943); *United States v. Petty Motor Co.,* 327 U.S. 372, 377–78, 66 S.Ct. 596, 90 L.Ed. 729 (1946).

The rationale for the general rule excluding going concern value in determining just compensation for the taking of fee title to property was explained by the Court in *Kimball Laundry Co. v. United States,* 338 U.S. 1, 69 S.Ct. 1434, 93 L.Ed. 1765 (1949):

[T]he denial of compensation for [the going concern value of a business] rests on a very concrete justification: the going-concern value has not been taken. . . . [O]nly the physical property has been condemned, leaving the owner free to move his business to another location. In such a situation there is no more reason for a taker to pay for the business' going-concern value than there would be for a purchaser to pay for it who had not secured from his vendor a

covenant to refrain from entering into competition with him. But such value as the good will retains, the owner keeps. . . . When a condemnor has taken fee title to business property, there is reason for saying that the compensation due should not vary with the owner's good fortune or lack of it in finding premises suitable for the transference of going-concern value. In the usual case, most of it can be transferred [to new premises] . . . .

338 U.S. at 11–12, 69 S.Ct. at 1440–1441 (citations omitted).

Although, as indicated, in general, courts have refused to consider income generated by, or the "going concern" value of, businesses that are conducted on property that is condemned, as discussed above, the Supreme Court has steadfastly refused to declare any hard and fast rules in eminent domain cases. Thus, in numerous cases and under a variety of circumstances, the courts have carved out exception after exception to the "no consideration of going-concern value" rule.

For example, business revenues are included in valuing temporary takings, *see, e.g., United States v. General Motors Corp.,* 323 U.S. 373, 65 S.Ct. 357, 89 L.Ed. 311 (1945), and in cases involving rental properties. *See United States v. Certain Interests in Property in Cumberland County, North Carolina,* 296 F.2d 264 (4th Cir.1961). They are also considered as an element of value where the Government takes the specific business of the condemnee, *see Kimball Laundry v. United States, supra* or condemns the property with the intention of carrying on the condemnee's business. *See, City of Omaha v. Omaha Water Co.,* 218 U.S. 180, 30 S.Ct. 615, 54 L.Ed. 991 (1910); *United States v. 0.88 Acres of Land,* 670 F.Supp. 210 (W.D.Mich.1987). Similarly, going concern value has been included where the proper-

ty condemned has no market, *see Monongahela Navigation Co. v. United States, supra,* or where there are no comparable sales of like property. *See Brooklyn Eastern District Terminal v. City of New York,* 139 F.2d 1007, 1013 (2nd Cir.1944) ("[L]oss of business profits as such is not allowable; but in default of more direct evidence of sale value, present value of clearly to-be-expected future earnings may be considered." (citations omitted).) Furthermore, the Supreme Court has specifically endorsed valuing commercial property in terms of the capitalized earnings produced when the market value is too difficult to find, or when its application would result in "manifest injustice to the owner or the public." *See United States v. 564.54 Acres of Land in Monroe and Pike Counties, Pennsylvania,* 441 U.S. 506, 515, 99 S.Ct. 1854, 1859, 60 L.Ed.2d 435 (1979). In all of these cases, the courts have been guided by "basic equitable principles of fairness." *Id.,* 441 U.S. at 517, 99 S.Ct. at 1860.

Applying basic equitable principles of fairness, the Court finds that, in this case, the value of Defendants' duty-free business must be considered in determining the amount of just compensation owed by the Government. In reaching this conclusion, the Court finds that the Government's taking of Defendants' property is akin to the situation in which the Government condemns property with the intention of carrying on the business of the condemnee. As explained by the Court in *Kimball Laundry, supra,*

> [W]hen the Government has condemned business property with the intention of carrying on the business... [t]he owner retains nothing of the going-concern value that it formerly possessed; so far as control of that value is concerned, the taker fully occupies the owner's shoes.

\*   \*   \*   \*   \*   \*

> ... The rationale of [these] cases... must therefore be that **an exercise of the power of eminent domain which has the inevitable effect of depriving the owner of the going-concern value of his business is a compensable "taking" of the property**.... If such a deprivation has occurred, the going-concern value is at the Government's disposal whether or not it chooses to avail itself of it. Since what the owner had had transferrable value, the situation is apt for the oft-quoted remark of Mr. Justice Holmes, "the question is, What has the owner lost? not, What has the taker gained."

338 U.S. at 13, 69 S.Ct. at 1441 (emphasis added). *See also, United States v. 0.88 Acres of Land, supra.*

In this case, the Government's taking of Defendants' property has the "inevitable effect of depriving the. owner of the going-concern value of his business." As a duty-free business, limited by statutory and regulatory constraints as to location, Defendants are not free to relocate their business to a new location of their choosing. The Tariff Act duty-free enterprise provisions currently in effect specifically limit operation of duty-free business to locations "at or beyond the exit point" of United States territory, unless the location of a the duty-free store was approved by Customs prior to 1988, as was the case with Commodities. *See* 19 U.S.C. § 1555(b)(F)(ii).

Although the statute itself leaves a door open for the possibility of a condemned duty-free business owner to find a suitable location "at or beyond the exit point" of the United States, for Defendants in this case, this would be virtually impossible.

As discussed above, the Ambassador Bridge is owned by DIBCO. DIBCO's principal owner is also the principal owner of Ammex, Commodities' only competitor

for duty-free business in Detroit. Ammex already has a store on the Ambassador Bridge, "beyond the exit point" of the United States. It also has the only duty-free store "beyond the exit point" of the Detroit–Windsor Tunnel. Defendants previously sought to locate their business on the Ambassador Bridge apron "beyond the exit point," but DIBCO refused to permit them to do so. [*See* Plaintiff's Ex. A, p. 9.]

It is clear that DIBCO/Ammex would like to see Commodities cease doing business. The record of these proceedings shows that Ammex has in the past sought to buy-out Commodities. Furthermore, although there has never been any concrete evidence of "collusion" on the part of the Government and DIBCO to put Commodities out of business, the Court can hardly ignore or overlook the fact that when the Government asserted that it was not going to condemn Commodities in its entirety and was going to only take a small corner slice of its parking lot, DIBCO suddenly withdrew its agreement to the MOA and ceased contributing funds for the Customs Inspection Facility project. Now that the Government has changed its position and has decided to condemn Commodities' property in its entirety and leave, untouched the Ammex store, it is inescapable that, in effect, the Government will be granting a monopoly situation to Ammex.

Thus, just as the Supreme Court found in *Kimball Laundry* and as Judge Gibson found in the Sleeping Bear Sand Dunes case, *United States v. 0.88 Acres of Land, supra*, "The practical effect of the government's acquisition will be to deprive the defendants of the 'transferable intangible values of their former business,' and such

a loss must be compensated." 670 F.Supp. at 213.[17]

### E. *VALUATION DATE*

■ The Government's final argument concerns the date of valuation for the condemnation of Commodities' property. The Government contends that, for purposes of valuation, the "slice" of Commodities parking lot and the easement over the parking lot addressed in the 1996 Declaration of Taking should be valued as of December 5, 1996, the date of filing the 1996 action, and then, the remaining property, as burdened by the easement over the parking lot, should be valued for total taking purposes as of February 1, 2001, the date of the Government's filing of its newest Complaint and Declaration of Taking. Commodities asks the Court to order valuation of its property based on a total taking as of the first filed Complaint and Declaration of Taking, i.e., December 5, 1996.

The Court recognizes that in the ordinary case, by application of the general rule that the measure of compensation owed to the condemnee is based on value of the property at the date of the declaration of taking, *see United States v. Miller, supra*, the condemnation of Commodities' property could be viewed as a partial taking in 1996 followed by a taking of the remainder five years later. However, as indicated above, there are no hard and fast rules in eminent domain actions. Instead, the Supreme Court has repeatedly instructed that lower courts are to consider what is "fair" and "just" each case. *See United States v. Commodities Trading Co., supra.*

The history of this case makes clear that it is not an "ordinary" case.

---

**17.** Of course, if the Government were willing to pay for the relocation of Commodities to another venue on the expanded site, many of the concerns in not valuing the property as an

on-going business would be alleviated, since Commodities could continue business at the relocated site.

When the MOA was entered into between the Government and DIBCO in 1991, it is undisputed that the Government expressed an intent to take all of Commodities property. It was only when faced with an adverse ruling by the Sixth Circuit Court of Appeals on Defendants' appeal of this Court's refusal to allow them to intervene in the DIBCO condemnation action that the Government announced a different intention—that it would be taking only a small portion of Commodities' parking lot. Throughout the ensuing eight years, the Government repeatedly reiterated both to this Court and to the Sixth Circuit that it had no intention of condemning all of Defendants' property. The Government's 1996 Complaint and Declaration of Taking reflected this taking of only a "slice" of Commodities' parking lot so that it could build a truck ramp to the Customs Cargo Inspection facility.

The Government, however, never exercised its 1996 Declaration of Taking, i.e., it never took physical possession of the "slice" of property and no construction whatsoever of the truck ramp was ever begun. The lack of possession and actual construction suggests little, if any, practical effect of the 1996 filing.[18]

Then suddenly, at the end of February 2000, after this action had been scheduled for trial on the issue of just compensation owed to Commodities for the taking of the slice and on the eve of the then scheduled Final Pretrial Conference, the Government reversed itself and advised the Court that it had determined that it needed to take Commodities' property in its entirety, after all. But, despite having so notified the Court, the Government did nothing to effectuate such a total taking. Finally, in December 2000, ten months later, the Court ordered the Government to file an amended complaint and amended declaration of taking by the end of February 2001.

Despite the Court's direct and explicit Order, however, the Government *sua sponte* decided *not* to amend its 1996 complaint and declaration of taking as it had been ordered to do, and instead filed an entirely new condemnation action to take all of Commodities' property. When questioned by the Court as to why a new complaint and declaration of taking had been filed instead of amending its 1996 filing as directed, counsel for the Government merely said that he decided a new complaint and new declaration of taking was "a better idea."

The Government now seeks to take advantage of its failure to follow the Court's direct Order by arguing that the date of valuation of the complete taking of Commodities' property is controlled by the date of its Declaration of Taking of the whole parcel, i.e., February 1, 2001.[19] The Government should not be entitled to profit from its misleading of the Court and refusal to follow Court orders.

**18.** The Court recognizes that there were challenges by Commodities to the propriety of the taking of even a "slice" of the parking lot. However, all of these issues were resolved by the Court as of March 1999, yet the Government took no action since that time with respect to the corner slice of the property.

**19.** The Government has never explained its reasons for insisting on the date of the new Complaint as the date of valuation other than to repeat the general rule that property is valued as of the date of the declaration of taking. It appears, however, that the Government wants the Court to value the total taking using the 2001 date because use of this date would relieve the Government of having to pay interest accruing since 1996 on the difference between what it deposited as estimated compensation in 1996 (i.e., $ 5,000) and what the jury ultimately finds as owning for the total taking of the property. *See* 40 U.S.C. § 258a. (It likely would also render Commodities subject to any decrease in property value over that period of time.)

 

Since the Government has for years avowed to this Court and to the Court of Appeals that it had no intention whatsoever of putting Commodities out of business, the Court believes that the Government should be held to its word. Either the Government relocates Commodities' duty-free business to an appropriate site with substantially similar access to the Ambassador Bridge [20] or pays Commodities the on-going concern value of its business as of December 5, 1996. In order to do substantial justice in this case, equity demands no less.

## CONCLUSION

For all of the foregoing reasons,

IT IS HEREBY ORDERED that the Government's Motion *in Limine* to Exclude Valuation Testimony be, and hereby is, DENIED.

IT IS FURTHER ORDERED that Defendants shall be entitled to present evidence at trial concerning the value of Commodities' duty-free business.

IT IS FURTHER ORDERED that for purposes of determining just compensation for the taking of Commodities' property in its entirety, the date of valuation shall be December 5, 1996.

IT IS FURTHER ORDERED as set forth in the Court's December 19, 2000 Order, the parties shall file and serve their

valuation experts' reports within 14 days of the date of this Order.

SO ORDERED.

---

**20.** Providing a condemnee with "substitute" facilities in lieu of monetary compensation has been sanctioned by the courts when the circumstances so warrant it. *See, e.g., Brown v. United States,* 263 U.S. 78, 44 S.Ct. 92, 68 L.Ed. 171 (1923); *United Sates v. Village of Stoutsville, Missouri,* 531 F.2d 882 (8th Cir. 1976). *Cf., United States v. 564.54 Acres of Land in Monroe and Pike Counties, Pennsylvania,* 441 U.S. 506, 99 S.Ct. 1854, 60 L.Ed.2d 435 (1979) (where market existed for recreational summer camps, albeit not an extremely active one, market value was sufficiently

ascertainable and, hence, the government was not required to compensate condemnee for costs of developing substitute facilities). In this case, the Government represented to the Court in a February 2000 telephonic conference that it would be willing to relocate Commodities but could not do so at that time because the Michigan Department of Transportation ("MDOT") had not yet completed its plans to acquire what would apparently be the nearest available property for a new Michigan Visitors' Center.