**UNITED STATES of America, Plaintiff,**

**v.**

**0.88 ACRES OF LAND, et al., Defendants.**

**No. G79-360 CA.**

United States District Court, W.D. Michigan, S.D.

Sept. 1, 1987.

John Smietanka, U.S. Atty., by Don Daniels, Asst. U.S. Atty., Grand Rapids, Mich., for plaintiff U.S.A.

Rhoades, McKee & Boer by Dale W. Rhoades, Arthur C. Spalding, Grand Rapids, Mich., for defendants William & Betty Robinson.

OPINION

BENJAMIN F. GIBSON, District Judge.

This is a land condemnation case involving property being taken by the United States Government, pursuant to its power of eminent domain, to establish the Sleeping Bear Dunes National Lakeshore. The United States seeks title to 0.88 acres, more or less, of the defendants' land. The subject tract, which is adjacent to the current boundaries of the Sleeping Bear Dunes National Park ("SBD"), is known as "Casey's Corners," a canoe and boat livery, service station and grocery located on M-22 and the Platte River. The instant action arises from the inability of the parties to agree on the proper valuation of the condemned property.

The defendant landowners contend that in the process of condemnation, the government is not only taking the property but, in effect, is taking the business as a whole. Thus, in addition to compensation for the land, the defendants seek damages for the loss of the entire business, including items used in furtherance of the business and its goodwill and going-concern value. Alternatively, should the Court fail to find a "business taking" the defendants contend that the items used in their business are fixtures which are subject to compensation.

The government contends that it does not intend a "business taking" and that therefore defendants are only entitled to remuneration for the fair market value of the land, real improvements and any fixtures. However, it is disputed which items are within the definition of compensable fixtures.

This Court previously appointed a commission under Fed.R.Civ.P. 71A(h) to determine the issue of just compensation; however, the matter is back before this Court upon motion of the government. On July 2, 1987, the Court held an evidentiary hearing on the issue of the quantum and nature

of the property being taken by the government. The matter is now before the Court for decision.

This Court has already addressed the legal issues concerning compensation for a "business taking" and for fixtures. On the issue of business taking, the Court concluded that damages for the loss of goodwill or loss of the going-concern value of a business are not compensable unless the government has condemned the business property with the intention of carrying on the business.[1] *United States v. 0.88 Acres Of Land,* No. G79-360 (W.D.Mich. Jan. 27, 1982). The Court noted that in such situations, the condemning authority in effect takes the business since, in a monopoly situation, the former owner cannot establish a rival operation capable of receiving any of the former business' transferable intangible value. *Id.* at 2. Additionally, the Court ruled that compensable fixtures are those items which are annexed to, adapted to, and intended to be a permanent accession to the realty, and that such items are compensable to the extent that the market value of the land is enhanced by such fixtures. The Court further concluded, however, that personal property, outside this definition, is noncompensable.[2] *United States v. 0.88 Acres of Land,* No. G79-360 (W.D.Mich. Aug. 12, 1982).

Applying the above standards to the evidence in this case, the Court must determine whether the government seeks to take the defendants' property with the purpose of maintaining the canoe livery business. Such a finding would incorporate compensation for all of the defendants' business, including those items presently contested as fixtures. However, should the defendants fail to establish a business taking, the Court must address the question of whether the many items in dispute meet the legal definition of compensable fixtures.

It is the defendants' contention that various government documents received into evidence conclusively establish the government's intention to create a monopoly situation and take "any transferable and tangible value of the former business." These documents include the "Sleeping Bear Dunes National Lake Shore General Management Plan," dated October 1979 ("GMP"); a National Park Service ("NPS") briefing paper entitled "Platte River Canoe Liveries, Sleeping Bear Dunes National Lakeshore" ("briefing paper"); and the "Sleeping Bear Dunes National Lakeshore Final Land Protection Plan" ("LPP"), dated December 27, 1983. Also, in connection with this matter, the Court received testimony from Mr. William Robinson, the land-

1. The Court's holding, as embodied in its Order to the commissioners, is as follows:

"A property owner may under certain circumstances present evidence regarding the goodwill and going-concern value of his business. A property owner is entitled to be compensated for the goodwill and going-concern value of his business if:

(1) that value is not derived from the owner's idiosyncratic attachment to the property, but is a value capable of transfer from owner to owner, and;

(2) the condemning authority intentionally acquires the property owner's business thereby depriving the property owner of the good will and going-concern value of his business."

2. The Court's holding on the issue of fixtures, as embodied in its Order to the commissioners, is as follows:

"A property owner is entitled to compensation for his fixtures. The test to be applied in order to ascertain whether or not an item is a fixture emphasizes three factors:

(1) Annexation to the realty, either actual or constructive;

(2) Adaptation or application to the use or purpose of that part of the realty to which it is connected or appropriated; and

(3) Intention to make the article a permanent accession to the realty. The intention which controls is that manifested by the objective, visible facts. The permanence required is not equated with perpetuity. It is sufficient if the item is intended to remain where affixed until worn out, until the purpose to which the realty is devoted is accomplished or until the item is superseded by another item more suitable for the purpose.

With regard to those items properly within the definition of a fixture, you should award the value of the land as enhanced by the fixtures in place. With regard to those items of personal property outside the definition of a fixture, no compensation whether for removal, reinstallation, or any other cost, should be awarded."

owner, and Mr. Richard Peterson, superintendent of the SBD.

Paragraph 12 of the GMP contains language which indicates that the long range goal for the area encompassing the defendants' property is to provide one canoe livery.[3] Further, the briefing paper states that the NPS intends to consolidate the three existing commercial liveries into one operation, with the new operation being placed under a concession contract.[4] The LPP also contains a reference to the long range goal of providing one livery. Moreover, the LPP references the protection alternatives available to existing businesses as being either an agreement or fee acquisition. The LPP indicates that the agreements contain developmental and use restrictions with no corresponding compensation and that fee acquisition could deprive lakeshore visitors of compatible services and deprive commercial owners their livelihood. Additionally, the LPP states that if acquisition is necessary, consideration will be given for the livery and camping operations to be continued, either by a sellback arrangement or by concession contract.[5]

Having reviewed the above documents in light of the testimony presented, the Court concludes that the government does indeed seek to condemn the defendants' property with the intention of carrying on the business. It is clearly undisputed that a canoe livery will be operated on the condemned property. The clear import of the documents is that, over a period of time, the government intends to acquire all the livery property and form one operation under a concessions contract. This conclusion is butressed by the testimony of Mr. Peterson who acknowledged the government's intent to consolidate the three liveries into one. Moreover, there is no question that the ultimate plan would create a monopoly business situation, thereby rendering it impossible for the defendants to receive any transferable intangible value of their former business. Mr. Robinson testified that the nature of his business involves launching canoes from his present location upstream and then retrieving them at a point downstream. He further indicated that his business is dependent on access to the river, that there is no suitable launching area

3. The pertinent portion of paragraph 12 of the GMP reads:

"Access to the Platte River Campground, at the junction of the Platte River and M-22, will be relocated. The existing boat liveries will continue to operate under agreements and controls as provided for in the establishing legislation. The long-range goal will be to provide one livery, with picnic facilities and a central parking area, on the south side of the Platte River if the private properties become available for acquisition."

4. The pertinent portion of the briefing paper states:

"The intent of the National Park Service as expressed in the Sleeping Bear Dunes National Lakeshore General Management Plan, is to consolidate the three existing commercial liveries into one operation. To accomplish this goal, some, or all, of the existing properties will have to be acquired. This acquisition will be on a willing seller, willing buyer basis and as long as the properties are privately owned, new park development will be planned around them. If all three liveries are eventually acquired, the new operation will then be place under a concession contract. If at any time the canoe liveries fail to comply with the terms of the enabling legislation or the agreement, they will be subject to condemnation and acquisition."

5. The testimony indicated that any reference to Casey's Corners is omitted from the LPP as condemnation proceedings had already been commenced. The pertinent portions of the LPP at page 27 read:

"In light of the legislative requirements noted in Chapter III, only two protection alternatives are feasible for the Riverside Canoe Livery and the K.O.A. Campground. These are agreements and fee acquisition."

"The owners of Riverside have also expressed dissatisfaction with the agreement approach, disagreeing with its legal basis and the lack of compensation for development and use restrictions."

"Fee acquisition could deprive lakeshore visitors of compatible services, deprive the commercial owners of the livelihood, and be the most costly to the Federal Government. For these reasons, agreements will continue to be sought with the owners of both properties. If negotiations fail, the National Park Service will seek to acquire the properties in fee, first at a mutually-agreeable price; failing that, through condemnation proceedings."

"If acquisition is necessary, consideration will be given for the livery and camping operations to be continued, with appropriate restrictions, through use of a sellback arrangement or through concessions contracts."

further downstream and that regulations preclude launching inside the park if the livery is located outside the park boundaries. Thus the undeniable result is that there would be no feasible means of competition with the government's proposed operation. In fact, the LPP specifically notes that acquisition of the properties at issue would terminate compatible services and in effect "deprive the commercial owners of their livelihood."

It is clear that a canoe livery, constituting a monopoly business, will be continued on the condemned location at the government's behest. Thus the issue to be addressed is whether, as the government contends, there must be an intent to take over and operate the business directly, rather than through third party obligees or concessionaires, in order to constitute a business taking. *C.f. City of Omaha v. Omaha Water Co.,* 218 U.S. 180, 30 S.Ct. 615, 54 L.Ed. 991 (1910). It is the government's position, as espoused by Mr. Peterson, that the NPS has no authority to operate a business and that the operation of an ongoing business by the NPS is totally inconsistent with its proposal to create a single livery.

The Court is of the opinion, based on the facts and circumstances of this case, that the distinction between creation of and operation of the business is not dispositive on the issue of business taking. The Court declines to adopt the government's narrow application of the concept of a "business taking." While direct operation of a business is a significant factor to be considered, an analysis of a business taking must be made on a case by case basis, taking into consideration the totality of the circumstances. In the instant case, there is undisputed evidence that the government intends to continue to provide a service of the same nature as the current business. Although the government would not *per se* own the business, the evidence indicates that the government would take more than a passive role in ensuring its creation and that it would financially benefit from its existence. Furthermore, the business would be run under restrictive guidelines set by the NPS. Mr. Peterson testified that should the government condemn the existing facilities but is unable to retain a concessionaire who is willing to build, the government would construct the new facilities including the building, ramp and dock. Moreover, Mr. Peterson indicated that a 5% fee would be negotiated into the concession contract. The Court concludes that where, as in this case, 1) the government intends to construct facilities in substitution for an existing business; 2) the new business is operated under the government's pervasive regulation; 3) the government creates a monopoly situation and realizes a pecuniary interest by doing so, the government's activity is tantamount to the operation of the ongoing concern which, in turn, comprises a business taking. The practical effect of the government's acquisition will be to deprive the defendants of the "transferable intangible values of their former business," and such a loss must be compensated. *0.88 Acres,* slip op. at 2. (W.D.Mich. Jan. 27, 1982). Having found a business taking, the Court need not address the issues concerning compensable fixtures.

Accordingly, an order shall issue instructing that the defendant landowners be compensated for the loss of the business as whole, including any good will and going-concern value.