**HUNTLEIGH USA CORPORATION,**
Plaintiff,

v.

**The UNITED STATES, Defendant.**

No. 03–2670C.

United States Court of Federal Claims.

Jan. 7, 2005.

Jonathan Jacob Lerner, Skadden, Arps, Slate, Meagher & Flom, L.L.P., New York, N.Y., with whom was Lauren E. Aguiar, Skadden, Arps, Slate, Meagher & Flom, L.L.P., for plaintiff.

Mark A. Melnick, Assistant Director, Commercial Litigation Branch, Civil Division, United States Department of Justice, Washington, D.C., with whom were Peter D. Keisler, Assistant Attorney General, and David M. Cohen, Director, for defendant. Amy Allen Ruggeri, Assistant Chief Counsel, Of-

fice of Chief Counsel, Transportation Security Administration, of counsel.

## OPINION

MARGOLIS, Senior Judge.

This action is before the Court on defendant's motion to dismiss Counts I and II of plaintiff's complaint. Plaintiff, Huntleigh USA Corporation ("Huntleigh"), filed a complaint against defendant, the United States, alleging two counts. First, plaintiff alleges that defendant violated the Takings Clause of the Fifth Amendment to the United States Constitution when it federalized airport security at all domestic commercial airports thereby displacing Huntleigh, who had previously provided these services to various air carriers. Second, plaintiff alleges that defendant violated § 101(g) of the Aviation and Transportation Security Act, Pub.L. No. 107–71, 115 Stat. 597 (the "Act") (codified primarily in sections of Title 49 of the United States Code), which according to plaintiff requires the Transportation Security Administration ("TSA") to pay adequate compensation to private security screening companies for the loss of their contracts. Plaintiff contends that defendant violated § 101(g) of the Act when it refused to provide plaintiff with adequate compensation for the loss of its private screening contracts. Specifically, defendant contends that Count I of the complaint should be dismissed because plaintiff has failed to state a claim upon which relief may be granted. Additionally, defendant contends that Count II of the complaint should be dismissed because the court lacks jurisdiction or, in the alternative, because plaintiff has failed to state a claim upon which relief may be granted. After careful consideration of the briefs and oral argument, the Court denies defendant's motion to dismiss Counts I and II.

## FACTS

On November 19, 2001, in response to the September 11, 2001 hijackings, the United States Congress enacted the Aviation and Transportation Security Act, Pub.L. No. 107–71, 115 Stat. 597. The Act created the Transportation Security Administration and charged it with carrying out, among other things, civil aviation security functions, including security screening operations for passenger air transportation. Pub.L. No. 107–71, § 101(a), 115 Stat. 597, 597–602. The Act shifted the responsibility for screening passengers and property boarding aircrafts from private companies to TSA. 49 U.S.C. § 44901(a). To carry out this shift, the Act sets forth various deadlines that TSA was required to meet. Of importance to this action, TSA was required to: (1) assume civil aviation security functions and responsibilities not later than three months after the date of enactment of the Act (February 19, 2002), § 101(g)(1), and (2) have a sufficient number of federalized screeners in place to screen all passengers and property that would be boarding aircrafts at all 429 domestic commercial airports not later than one year after the date of enactment of the Act (November 19, 2002), § 110(c)(1). Thus, TSA had a nine-month period to transition from private screeners to federal screeners.

The Act set out two approaches that TSA could use in transitioning from private to federalized airport security screening. First, TSA could assume the rights and responsibilities of air carriers under existing screening contracts. § 101(g)(2). Second, TSA could obtain, through agreements with air carriers, the assignment of existing screening contracts. § 101(g)(3). Thus, if TSA chose to utilize either of these two approaches, it would essentially be taking the place of the air carriers with respect to their contracts with private screening companies. If TSA chose to use the second approach, the Act required that the agreements be entered into not later than 90 days after the date of enactment. Further, the Act mandated that the agreements be for one 180–day period, which could be extended for one 90–day period if the Under Secretary determined that such an extension was necessary. § 101(g)(3)(B).

TSA ultimately chose a different approach. Under TSA's approach, private security companies submitted bids for interim contracts with the government, which remained in effect for up to the nine-month transition period.

Huntleigh is a private security company. Since 1988, Huntleigh has provided passenger and baggage screening at airports throughout the United States. At the time the Act was passed, Huntleigh had contracts with eight major airlines, and a number of smaller air carriers, to provide passenger and baggage screening services at 35 airports across the United States. Huntleigh's contract with each airline consisted of a core agreement, with addendums for each separate airport location. These contracts generally had a term of three years, with a provision for automatic renewal, which the airlines often invoked.

In July 2002, Huntleigh received notices from the government informing it that TSA would be replacing Huntleigh's screening checkpoints one by one. On July 23, 2002, the government terminated the first Huntleigh security checkpoint. Over the next four months, TSA terminated all of Huntleigh's additional checkpoints. By November 2002, TSA had fully federalized airport security screening. As a result, Huntleigh alleges it has been forced out of the airport security industry, but continues to provide some non-security related services to air carriers and airports, such as skycap services, baggage handling, and janitorial services. On November 14, 2003, Huntleigh filed a complaint with this Court.

### DISCUSSION

#### I. Standard of Review

Count I of Huntleigh's complaint alleges that by federalizing airport security at all domestic commercial airports, the federal government has taken Huntleigh's security business for public use without providing just compensation, in violation of the Fifth Amendment to the United States Constitution. Specifically, Huntleigh contends that

the government's actions constituted a taking of its (1) contracts[1] and (2) goodwill and going-concern value.

Count II of the complaint alleges that by failing to pay adequate compensation to Huntleigh for the loss of its contracts with the airlines, the TSA has violated § 101(g) of the Act. Specifically, Huntleigh contends that it is entitled to the fair market value of the contracts based on their initial term as well as compensation for the delay in payment from the time the contracts were taken over by the government.

When considering a motion to dismiss a claim under RCFC 12(b)(6), a court must accept as true all well-pled factual allegations and draw all reasonable inferences in plaintiff's favor. *DeMarco Durzo Dev. Co. v. United States*, 60 Fed.Cl. 632, 635 (2004) (citing *Godwin v. United States*, 338 F.3d 1374, 1377 (Fed.Cir.2003)). Such a motion should be granted only when "it appears beyond doubt that the plaintiff can prove no set of facts in support of his claim which would entitle him to relief." *Scheuer v. Rhodes*, 416 U.S. 232, 236, 94 S.Ct. 1683, 40 L.Ed.2d 90 (1974) (quoting *Conley v. Gibson*, 355 U.S. 41, 45–46, 78 S.Ct. 99, 2 L.Ed.2d 80 (1957)). Therefore, the Court must determine if, given plaintiff's allegations, it is beyond doubt that there are no set of circumstances that would entitle plaintiff to relief for its claims that the government took its screening contracts, goodwill and going-concern value without just compensation.

"Jurisdiction over any suit against the Government requires a clear statement from the United States waiving sovereign immunity, together with a claim falling within the terms of the waiver." *United States v. White Mountain Apache Tribe*, 537 U.S. 465, 472, 123 S.Ct. 1126, 155 L.Ed.2d 40 (2003) (citations omitted). The Tucker Act contains

---

1. Count I of Huntleigh's complaint alleges that the government took the goodwill and going-concern value of its business and does not mention contracts. However, throughout the complaint Huntleigh asserts that it lost its screening contracts as a direct result of the government's actions. Because a court must construe the allegations in the complaint broadly and in plaintiff's favor in considering a motion to dismiss, this Court finds that Huntleigh's complaint sufficient-

ly alleges a taking of both its screening contracts and its goodwill and going-concern value. *See First Hartford Corp. Pension Plan & Trust v. United States*, 194 F.3d 1279, 1287 (Fed.Cir.1999) ("Because granting [a motion to dismiss] summarily terminates the case on its merits, courts broadly construe the complaint.") (quoting *Ponder v. United States*, 117 F.3d 549, 552–53 (Fed. Cir.1997)).

such a waiver, and gives this Court jurisdiction over claims against the United States that seek money damages and are "founded either upon the Constitution, or any Act of Congress." 28 U.S.C. § 1491(a)(1). Thus, plaintiff must point to some constitutional or statutory provision that "can fairly be interpreted as mandating compensation by the Federal Government for the damage sustained." *White Mountain Apache Tribe,* 537 U.S. at 472, 123 S.Ct. 1126 (quoting *United States v. Mitchell,* 463 U.S. 206, 217, 103 S.Ct. 2961, 77 L.Ed.2d 580 (1983)). In this case, plaintiff's claim for monetary damages is based on § 101(g) of the Aviation and Transportation Security Act.

## II. *Count I—Takings Claim*

"Whether or not a taking has occurred is a question of law based on factual underpinnings." *Cienega Gardens v. United States,* 331 F.3d 1319, 1328 (Fed.Cir.2003) (citing *Bass Enters. Prod. Co. v. United States,* 133 F.3d 893, 895 (Fed.Cir.1998)). In analyzing a takings claim a court must undertake three separate inquiries. First, a court must determine whether the subject of the alleged taking is property for purposes of the Takings Clause. If it is, the court must then determine whether the government action constituted a compensable taking, that is, whether the government interference goes "too far." *Penn Central Transportation Co. v. New York City,* 438 U.S. 104, 124, 98 S.Ct. 2646, 57 L.Ed.2d 631 (1978) (laying out a three-factor analysis to assess whether a given regulation goes "too far" for purposes of the Takings Clause). Finally, if the court finds that a taking has occurred, it must determine the amount of just compensation.

In this case, defendant contends that Huntleigh's takings claim fails to state a claim for two separate reasons: (1) that Huntleigh fails to assert a valid property interest compensable under the Fifth Amendment; and (2) that, even if Huntleigh does have a valid property interest, the government's action in this case did not constitute a compensable taking.

## A. Nature of Plaintiff's Claim

■ As a threshold matter, the Court must determine how to characterize plaintiff's claim. Plaintiff asserts that it has a protected property interest in its business assets, including its long-running contracts with established customers, goodwill, and going-concern value. Plaintiff further alleges that upon passage of the Act, its protected property interest was taken without just compensation. Defendant, on the other hand, asserts that mere engagement in a business activity is not protected property under the Fifth Amendment, and therefore, that a Fifth Amendment taking has not occurred. Thus, the question is whether Huntleigh has alleged that its *business assets* or its *right to engage in the business of passenger and baggage screening* has been taken. Such a distinction is crucial. If the Court were to agree with the government that Huntleigh has alleged nothing more than a taking of its right to engage in a particular business activity, the Court would grant the government's motion to dismiss. As the government correctly points out, mere engagement in a particular business activity is not property protected by the Fifth Amendment.

Despite the government's attempt to characterize plaintiff's claim, the Court finds that plaintiff has alleged that its business assets were taken, including its contracts, goodwill, and going-concern value. Defendant is mistaken in its characterization of plaintiff's claim, as plaintiff repeatedly states that by federalizing airport security at all the nation's airports, the government has taken its business assets. Accordingly, the Court will analyze whether Huntleigh's business assets are compensable property under the Fifth Amendment.

## B. Contracts, Goodwill and Going–Concern Value

■ Plaintiff alleges that by virtue of the Act, the government has taken its business assets, including its long-term screening contracts, goodwill and going-concern value. The government admits that contracts are property. Therefore, plaintiff's allegation that it had a contractual right to provide screening services to various airlines sufficiently sets forth a property interest. *See Cienega Gardens,* 331 F.3d at 1329–30. The

**445**

parties dispute, however, whether goodwill and going-concern value are property under the Takings Clause. Plaintiff cites *Kimball Laundry Co. v. United States,* a case where the Army temporarily condemned the plaintiff's laundry plant during World War II. 338 U.S. 1, 69 S.Ct. 1434, 93 L.Ed. 1765 (1949). There, the plaintiff asserted that it was entitled not only to compensation for the value of the use of its plant and equipment, but also for the "diminution in the value of its business due to the destruction of its 'trade routes.'" *Id.* at 8, 69 S.Ct. 1434. The term "trade routes," explained the court, served as a "general designation both for the lists of customers built up by solicitation over the years and for the continued hold of the Laundry upon their patronage." *Id.* In other words, the Laundry's going-concern value. Thus, the court found that the government was required to compensate the plaintiff for the going-concern value of its laundry business. *Kimball Laundry,* 338 U.S. at 12, 69 S.Ct. 1434.

Defendant argues, however, that going-concern value is only compensable under the Fifth Amendment when the government has *temporarily* taken control of a claimant's tangible business assets. The government also relies on *Kimball Laundry* because the Court held that the Army's temporary, rather than permanent, use of the plaintiff's property was a taking. *Id.* at 12, 69 S.Ct. 1434. The government asserts that when the taking of tangible business assets is permanent, going-concern value does not afford recovery.

This Court is not persuaded by the government's argument. In *Kimball Laundry,* the court found the government's use of the plaintiff's property to be a compensable taking *not* because the use was temporary, but because the use precluded the plaintiff from capitalizing on its trade routes. As the court noted, "[t]he government's temporary taking of the Laundry's premises could no more completely have appropriated the Laundry's opportunity to profit from its trade routes than if it had secured a promise from the Laundry that it would not for the duration of the Government's occupancy of the premises undertake to operate a laundry business any-

where else in the City of Omaha." *Id.* at 14, 69 S.Ct. 1434. The government asserts that Huntleigh, unlike Kimball Laundry, remains completely free to exploit its intangible assets anyway it wants. However, Huntleigh, like Kimball Laundry, has no alternatives under the Act. Because the Act makes it impossible for Huntleigh to conduct its airport security business at the nation's airports, it cannot simply "adjust" by entering into new contracts nor may it exploit its intangible assets elsewhere. Huntleigh's going-concern value allegedly has been severely diminished by the Act, and the government has been assured that there is no competition from Huntleigh. Like the plaintiff in *Kimball Laundry,* "[t]he owner retains nothing of the going-concern value that it formerly possessed; so far as control of that value is concerned, the taker fully occupies the owner's shoes." *Id.* at 13, 69 S.Ct. 1434.

Further, plaintiff asserts that its situation is similar to *United States v. 0.88 Acres of Land,* 670 F.Supp. 210 (1987). There, the government condemned the defendant's canoe and boat livery with the intention of consolidating all of the area's liveries into one large business. *Id.* at 211. The court held that the government's taking was compensable under the Fifth Amendment, stating where "1) the government intends to construct facilities in substitution for an existing business; 2) the new business is operated under the government's pervasive regulation; 3) the government creates a monopoly situation and realizes a pecuniary interest by doing so, the government's activity is tantamount to the operation of the ongoing concern which, in turn, comprises a business taking." *Id.* at 213. Plaintiff likens the present case to *0.88 Acres of Land,* asserting that the government intentionally assigned plaintiff's business to itself, depriving plaintiff of the transferable intangible value of its business.

Defendant responds by distinguishing both *Kimball Laundry* and *0.88 Acres of Land* from the present case by asserting that in those cases the government physically seized control of a business, whereas here, the government merely eliminated a market for the plaintiff's commercial services. Defendant

argues that the present case is similar to *Southern Counties Gas Co. v. United States,* 141 Ct.Cl. 28, 157 F.Supp. 934 (1958), where the government banned human habitation in a particular area, thereby destroying the demand for the plaintiff's utility services in that area. There, the court held that "the falling off of customers, though caused by the project, was not a taking." *Id.* at 935. The court's rationale was that even though the plaintiff's loss was due to the government's project, the loss was merely consequential, and plaintiff could still serve other customers throughout Southern California.

Huntleigh's loss, which was much greater than merely consequential to the government's action, was caused by the government's intended taking of its entire business. Here, the specific purpose of the Act was to replace private airport screeners with TSA airport screeners, or as plaintiff alleges, to completely exclude Huntleigh and other private companies from the airport screening business throughout the United States. This Court holds that Huntleigh's loss is more than consequential, and therefore, Huntleigh is entitled to develop a factual record in support of its assertion.

### C. Airline Screening—A Highly Regulated Industry

█ Defendant argues that Huntleigh had no underlying inherent right to engage in airline screening, given the pervasive government regulatory dominance over airline security. Defendant relies upon *Mitchell Arms, Inc. v. United States,* 7 F.3d 212 (Fed.Cir. 1993), where the plaintiff, a firearms importer who held a federal license to import and sell firearms, sued the government when it revoked all import licenses for assault rifles. The plaintiff claimed that the revocation of its license constituted a taking. The court found that Mitchell's expectation of selling assault rifles in the United States did not constitute a property right protected under the Fifth Amendment. *Id.* at 216. The court held that because Mitchell voluntarily entered the firearms import business, a governmentally controlled area, Mitchell did not have a property interest in its expectation of selling the assault rifles. *Id.* Here, defendant asserts that Huntleigh had no inherent right to engage in airline screening due to the pervasive government regulatory dominance over airline security. Defendant argues that by entering the airline screening industry, Huntleigh placed itself in an arena exclusively controlled by government regulation.

In *American Pelagic Fishing Company, L.P. v. United States,* 379 F.3d 1363 (Fed. Cir.2004), the plaintiff alleged a taking in violation of the Fifth Amendment when the government revoked its license to fish in any U.S. fishery within the Exclusive Economic Zone ("EEZ") in the Atlantic Ocean. *Id.* at 1369. The Federal Circuit held that American Pelagic did not have a property interest in its fishing permits. *Id.* at 1374. The court based its decision on *Conti v. United States,* another fishing license case. 291 F.3d 1334 (Fed.Cir.2002). In *Conti,* the court viewed Conti's fishing permit as a revocable license and stated that "no property rights are created in permits and licenses." *Id.* at 1340 (citing *United States v. Fuller,* 409 U.S. 488, 493, 93 S.Ct. 801, 35 L.Ed.2d 16 (1973)).

The government asserts that *American Pelagic* and *Mitchell Arms* apply to the current case because like the fishing industry, there was pervasive government regulatory dominance over airline security at the time Huntleigh entered the airline security business. Defendant maintains that Huntleigh never possessed any inherent right to engage in airline screening independent of the government's regulatory permission, and that while the government has revoked its permission to engage in airline screening, it has not otherwise impaired Huntleigh's going-concern value. The government claims that because Huntleigh remains free to engage in any other screening or security activities it wishes, it has hardly legislated Huntleigh out of existence.

Huntleigh maintains that even though the industry in which it operated was regulated by the government, it still possesses a compensable property right. Plaintiff acknowledges that prior to the passage of the Act, the government, through the FAA, heavily regulated airport security procedures. Plaintiff's position, however, is that while the

government had the right to alter the regulations governing airport security, it had no right to "legislate a private company out of existence." Pl.'s Opp. at 60. Plaintiff relies on *Cienega Gardens v. United States*, 331 F.3d 1319 (Fed.Cir.2003), where the court held that the plaintiff had vested property rights even in "an area voluntarily entered into and one which, from the start, is subject to pervasive Government control." *Id.* at 1330. In *Cienega Gardens*, real estate owners of low-income apartments sued the government when Congress enacted two statutes that abrogated the owners' rights to prepay their forty-year mortgage loans after twenty years. *Id.* at 1323. The plaintiffs argued that by enacting the statutes, the government had taken their property because the laws prevented them from exiting the housing programs after twenty years. The statutes prohibited the plaintiffs from regaining possession and control of their real estate because only extinguishment of their mortgages released the owners from the U.S. Department of Housing and Urban Development's low-rent housing programs. *Id.*

The court in *Cienega Gardens* rejected the government's assertion that the plaintiff could not demonstrate a protected property right "in an area voluntarily entered into and one which, from the start, is subject to pervasive Government control." *Id.* at 1330. The court held that the plaintiffs had vested property interests in the contractual right to prepay and exit the housing programs and thereby regain their normal rights of ownership.

This Court finds a significant difference between *Mitchell Arms* and *American Pelagic*, and the present case. In *Mitchell Arms*, the government's action revoked Mitchell's authority to import certain firearms into the United States. Otherwise, the court noted, "Mitchell retained complete control over the rifles. Mitchell could have done anything it wished with the rifles, except import them into the United States ...." *Mitchell Arms*, 7 F.3d at 217. The government did not take Mitchell's rifles, it merely took Mitchell's ability to market the rifles. The same was true of *American Pelagic*, where the plaintiff was only limited from fishing in the EEZ and could continue to fish in other parts of the Atlantic Ocean.

The present case is distinguishable from *Mitchell Arms* and *American Pelagic*. Although Huntleigh technically retains control over its business, there is nothing it can do with its business; Huntleigh cannot participate in the nation's airline screening industry. Defendant asserts that Huntleigh remains free to engage in airline screening activities that are permitted by law. This may appear to be the case, but in reality, Huntleigh is left with minimal business opportunity. Huntleigh's primary business was to provide security screening at the nation's airports, and that activity is now completely in the hands of the federal government. Further, the interests affected—Huntleigh's contracts, goodwill, and going-concern value—were inherent to its business with the nation's airlines. The business did not *depend* on the exercise of the government's regulatory power; the federal regulations merely dictated the procedures by which Huntleigh conducted its airline passenger screenings. In *Mitchell Arms* and *American Pelagic*, because the licensees could not assign, sell or transfer their licenses, they did not have property interests in their licenses. Huntleigh, on the other hand, owns its business assets and can assign, sell or transfer these assets.

Furthermore, the present case is not a licensing case. Rather, it is very similar to *Cienega Gardens* where the mortgage prepayment right at issue was created by the real estate owners' private contracts with private lenders. 331 F.3d at 1325. Here, Huntleigh's property rights, its contracts, goodwill, and going-concern value, were created by private contracts between Huntleigh and the nation's airlines. These rights cannot be illusory just because they concern activities subject to pervasive government control. Quoting *Cienega Gardens*, "[t]hat cannot be, and is not, the law." *Id.* at 1331. Further, in *Cienega Gardens* where the government essentially rewrote the contracts between the owners and the lenders, the court found there was a taking. The present case is even more egregious. More than rewriting the contracts between Huntleigh and the

nation's airlines, the government has taken over Huntleigh's position as the contractor, and has created for itself a sweeping monopoly over the entire industry.

Finally, contrary to the government's assertion, this is not a classic *Omnia* situation. *Omnia Commercial Co. v. United States*, 261 U.S. 502, 43 S.Ct. 437, 67 L.Ed. 773 (1923) (government's requisition of steel company's entire production of steel plates for one year, where plaintiff had contract with steel company to supply plaintiff with steel plate, was not a taking under the Fifth Amendment). Rather than merely bringing the contract between Huntleigh and the airlines to an end, as the government suggests, the government has appropriated Huntleigh's rights under the contract. The government has gone beyond merely taking over the subject matter of the contract, as was the case in *Omnia*. Rather, the government has kept the contract alive by stepping into Huntleigh's shoes as the contracting party.

Therefore, the Court holds that even though Huntleigh chose to do business in a highly regulated industry, it still has property interests in its assets.

### III. *Takings Analysis*

■ The Court must now determine whether or not the government's action constitutes a compensable taking, that is, whether the government has gone "too far." *See Pennsylvania Coal Co. v. Mahon*, 260 U.S. 393, 415, 43 S.Ct. 158, 67 L.Ed. 322 (1922). In *Penn Central Transportation v. New York City*, 438 U.S. 104, 124, 98 S.Ct. 2646, 57 L.Ed.2d 631 (1978), the Supreme Court identified three factors that have significance in determining whether a government regulation constitutes a taking: (1) the character of the governmental action; (2) the extent to which the regulation had interfered with distinct investment-backed expectations; and (3) the economic impact of the regulation on the claimant.

### A. The Character of the Governmental Action

■ Defendant argues that the character of the government's action should be considered "an exercise of the police power 'directed at protecting the safety, health, and welfare of the communit[y],'" and accordingly, does not require compensation. *See Rith Energy, Inc. v. United States*, 270 F.3d 1347, 1352 (Fed.Cir.2001). Defendant points to Congress' conclusion that the airlines' screeners failed to adequately protect the public, and as a consequence, public safety required government-controlled screening. Defendant maintains that the government has always had an interest in protecting the safety of airline passengers and has dictated airline screening procedures since at least 1974, with the advent of the federal nationwide anti-hijacking program. Therefore, the government argues that Huntleigh's status as a screening contractor did not flow from its own development of that market.

Plaintiff, on the other hand, characterizes the government's action as a complete monopolization of the airline security industry. In response to the government's assertion that it was entitled to use its police power to protect the public, plaintiff points out that the cases cited by the government involve claimants who themselves were found to present a danger to the public. *See Rith Energy v. United States*, 44 Fed.Cl. 108 (1999). Plaintiff alleges that unlike those plaintiffs, Huntleigh is a well-respected company that carried out its duties in compliance with the law, and in no way presented a danger to the public. Plaintiff alleges that it had been a leader in the industry for many years with a reputation for safety and excellent service. Additionally, plaintiff refutes the government's assertion that plaintiff operated its business at its peril by noting that the government has always relied heavily on private companies to provide airline passenger screening.

This Court agrees with plaintiff's characterization of the Act. In *Cienega Gardens*, the court held that the government's action constituted a compensable taking when it enacted two federal statutes that prevented owners of low-income apartments from prepaying their federally subsidized mortgages. *See Cienega Gardens*, 331 F.3d at 1338. There, the court stated that "Congress acted for a public purpose (to benefit a certain group of people in need of low-cost housing),

but just as clearly, the expense was placed disproportionately on a few private property owners .... Congress' *purpose* in enacting the statutes may have been entirely legitimate but the government has not shown that the *actions* Congress took—the enactment of ELIHPA and LIHPRHA—were within its powers to exercise without also granting compensation." *Id.* at 1338–1340 (emphasis in original). In the present case, as in *Cienega Gardens,* Congress acted for a public purpose in passing the Act, but the entire expense was placed on Huntleigh.

In *Rith Energy,* the court held that the revocation of the plaintiff's mining permit was an exercise of the government's police power aimed at protecting the safety, health, and welfare of the community surrounding the mine site. 270 F.3d at 1352. By contrast, Huntleigh allegedly is a company that carried out its screening duties in compliance with federal law. Therefore, at this stage of the proceeding, this Court does not consider the nature of the government's action to have been an appropriate exercise of police power. Rather, this Court holds that the nature of the government's action is the type that may require compensation, such that plaintiff should have the opportunity to present evidence.

## B. Government Interference with Reasonable Investment–Backed Expectations

The second factor of the takings analysis is the extent to which defendant has interfered with plaintiff's reasonable investment-backed expectations. Defendant asserts that because Huntleigh did business in a highly regulated industry, it did not possess any investment-backed expectations. Similar to its earlier argument, the government maintains that any property right that Huntleigh may have had was subject to a regulatory scheme intended to protect the public. The government argues that Huntleigh should have been aware that Congress would change the airline screening system if it concluded that the system was not performing effectively.

Huntleigh asserts that mere participation in a heavily regulated industry does not pre-

clude a plaintiff from ever prevailing on a takings claim. *Conti v. United States,* 48 Fed.Cl. 532, 537 (2001). In *Maritrans, Inc. v. United States,* 342 F.3d 1344, 1358 (Fed. Cir.2003), the court held that the plaintiff had reasonable investment-backed expectations in the continued use of its tank barges when they were rendered worthless due to government legislation that mandated single hull tank barges be retrofitted with double hulls to prevent oil spills. Plaintiff argues that it has a stronger claim than the plaintiff in *Maritrans* because although the legislation impacted Maritrans' assets, the government did not require the surrender of Maritrans' barges. Here, Huntleigh argues, the government has gone further; it has completely taken over Huntleigh's business. Huntleigh asserts that it should be entitled to the same opportunity as the plaintiff in *Maritrans* to develop the factual record and to present evidence.

Huntleigh knew it was operating in a highly regulated industry and does not challenge the government's ability to regulate procedures within the industry. What Huntleigh challenges is the destruction of its business. Huntleigh claims that it had the expectation that it would not be eliminated from the industry by the government, and in reliance, had invested significant resources to meet its long-term contractual obligations. Huntleigh alleges that it expanded its infrastructure by hiring and training a workforce of more than 3,000 screeners. Furthermore, Huntleigh maintains that contracts with air carriers were generally for three years, and the airlines often automatically renewed for multiple consecutive terms. These are reasonable investment-backed expectations. Huntleigh should, as it asserts, have the opportunity to present evidence that the government's actions interfered with its reasonable investment-backed expectations.

## C. Economic Impact of the Regulation

The third factor of the takings analysis is the economic impact of the regulation on the claimant. With regard to this factor, "[w]hat has evolved in the case law is a threshold requirement that plaintiffs show 'serious financial loss' from the regulatory imposition

in order to merit compensation." *Cienega Gardens*, 331 F.3d at 1340 (citation omitted). Huntleigh asserts that is has suffered devastating losses, which for purposes of this motion the Court must accept as true. These losses include the goodwill and going-concern value associated with its business, all of its airport screening contracts, its revenue stream, tangible property, and virtually all of its well-trained workforce. The government, on the other hand, argues that it is reasonable to impose the costs inherent in a failed business on the owner of the business.

The question here is the extent of Huntleigh's losses, and whether or not the Act actually had a significant effect on its business. This factor clearly illustrates the need for a factual record. Huntleigh has alleged substantial losses and should be entitled to present evidence.

## IV. *Count II—The Aviation and Transportation Security Act*

■ Huntleigh alleges that by failing to pay "adequate compensation" for the losses of its contracts with the airlines, the TSA has violated § 101(g) of the Aviation and Transportation Security Act. The relevant part of § 101(g) states:

(1) SCHEDULE FOR ASSUMPTION OF CIVIL AVIATION SECURITY FUNCTIONS.—Not later than 3 months after the date of enactment of this Act, the Under Secretary of Transportation for Security shall assume civil aviation security functions and responsibilities under chapter 449 of title 49, United States Code, as amended by this Act, in accordance with a schedule to be developed by the Secretary of Transportation, in consultation with air carriers, foreign air carriers, and the Administrator of the Federal Aviation Administration.

(2) ASSUMPTION OF CONTRACTS.— As of the date specified in paragraph (1), the Under Secretary may assume the rights and responsibilities of an air carrier or foreign air carrier contract for provision of passenger screening services at airports in the United States described in section 44903(c), subject to payment of adequate compensation to parties to the contract, if any.

(3) ASSIGNMENT OF CONTRACTS.—

(A) IN GENERAL.—Upon request of the Under Secretary, an air carrier or foreign air carrier carrying out a screening or security function under chapter 449 of title 49, United States Code, may enter into an agreement with the Under Secretary to transfer any contract the carrier has entered into with respect to carrying out the function, before the Under Secretary assumes responsibility for the function.

(B) SCHEDULE.—The Under Secretary may enter into an agreement under subparagraph (A) as soon as possible, but not later than 90 days after the date of enactment of this Act. The Under Secretary may enter into such an agreement for on 180–day period and may extend such agreement for one 90–day period if the Under Secretary determines it necessary.

Huntleigh argues that although § 101(g) clearly requires the government to compensate private security companies upon assuming their airline contracts, the government failed to do so. Huntleigh argues that by taking over its airline security screening business, the government assumed its contracts with the airlines. Furthermore, Huntleigh asserts that in its March 31, 2003 report to Congress, the TSA admitted that it had assumed private screening contracts when it stated:

As required by [the Aviation Transportation and Security Act], on February 17, 2002, TSA took over the responsibility for civil aviation security functions from [the] FAA and approximately 1400 FAA aviation security personnel became the core workforce of the TSA. That same day *TSA assumed the airlines' passenger screening company contracts* and all equipment used to perform passenger screening at the Nation's airports.

Transportation Security Administration, Report to Congress on Transportation Security 10 (Mar. 31, 2003) (emphasis added). Huntleigh contends that because § 101(g)(2) mandates compensation by the government, this

Court has jurisdiction over its claim of entitlement to compensation under the Tucker Act. *See* 28 U.S.C. § 1491(a)(1); *See also United States v. Testan,* 424 U.S. 392, 398, 96 S.Ct. 948, 47 L.Ed.2d 114 (1976) (because the Tucker Act does not itself grant a substantive right to compensation, jurisdiction depends on whether a statute confers a right to recover money damages).

Defendant argues that the Court lacks jurisdiction over Huntleigh's claim under § 101(g). Defendant contends that because jurisdiction under the Tucker Act requires that a source of law mandate compensation by the government, Huntleigh's claim fails to establish jurisdiction. In support of this assertion, the government points to the fact that § 101(g)(2) of the Act uses the word "may" rather than "shall" when referring to compensation. The government maintains that this language suggests that compensation was merely discretionary, and accordingly, Huntleigh has failed to point to a source of law that mandates compensation.

The Court must determine whether or not Huntleigh's contracts were assumed by the government. The government argues that because it chose to execute direct interim contracts with private screeners to perform screening for the government until particular locations could be converted to government personnel, it did not assume Huntleigh's contracts. The government asserts that it chose an alternative approach to transition to government screening, an option that was permitted by the Act. The Court is not persuaded by this assertion. Even though the interim contracts allowed Huntleigh to provide screening for nine additional months, ultimately the responsibility was transferred to the government. Although the government did not initially opt to "assume" the screeners' contracts, in the end, that is what it did. The government assumed Huntleigh's contracts when, at the end of the interim period, it transferred all of Huntleigh's security responsibilities to TSA personnel.

Furthermore, this Court has jurisdiction over Huntleigh's claim. In *United States v. White Mountain Apache Tribe,* 537 U.S. 465, 473, 123 S.Ct. 1126, 155 L.Ed.2d 40 (2003), the Court held that where the plaintiff's claim is founded upon a statute, "[i]t is enough … that a statute creating a Tucker Act right be reasonably amenable to the reading that it mandates a right of recovery in damages. While the premise to a Tucker Act claim will not be 'lightly inferred,' a fair inference will do." (citation omitted). In our case, Congress contemplated compensating a private company whose contract had been assumed when, in § 101(g)(2), it used the language "subject to payment of adequate compensation to parties to the contract, if any." Huntleigh's claim under the Act is for money damages, and a fair interpretation of the Act is that the government must compensate a company when the government assumes that airport screener's contract. Further, a court can construe a federal statute as money mandating even though the statute uses the word "may" rather than "shall." *Doe v. United States,* 100 F.3d 1576, 1580–84 (Fed.Cir.1996). For all of the above reasons, the Court denies defendant's motion to dismiss Count II. The issues in Count II clearly necessitate the development of a factual record.

The Court has considered the government's other arguments and found them without merit.

### *CONCLUSION*

For the foregoing reasons, the Court DENIES defendant's motion to dismiss Counts I and II